IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


**CINDY MUETH,**

**Plaintiff,**

**v.**

**NORRENBERNS FOODS, INC.,**
**d/b/a WESSEL'S MARKET,**

**Defendant.**                                     **No. 04-CV-0001-DRH**


## MEMORANDUM and ORDER

**HERNDON, District Judge:**

### I.  Introduction and Background

Pending before the Court is Defendant's motion for summary judgment (Doc. 18).  Plaintiff opposes the motion (Doc. 21).  Based on the pleadings, the applicable law and the following, the Court denies the motion.

On January 5, 2004, Cindy Mueth sued her employer, Norrenberns Foods, Inc., d/b/a Wessel's Market ("Norrenberns") for sex discrimination, sexual harassment, and retaliation in violation of the Title VII of the Civil Rights Act of 1964, **42 U.S.C. § 2000e, *et seq.*** (Doc. 1).  Mueth alleges that Norrenberns, through its store manager, subjected her to sexual harassment and that Norrenberns retaliated against her for reporting the sexually harassing conduct by creating a hostile work

environment and refusing to take action to prevent the harassing conduct from taking place and by cutting her hours of employment.

On January 20, 2005, Norrenberns moved for summary judgment arguing that Mueth cannot prove the alleged harassment was unwelcome or that the harassment was objectively hostile (Doc. 18).  Norrenberns also argues that Mueth did not subjectively believe that the work environment was hostile nor did it unreasonably interfere with her work performance and that it exercised reasonable care to prevent and correct any offensive behavior but that Mueth failed to take advantage of the preventative and corrective opportunities.  Mueth counters that Norrenberns mischaracterized and misrepresented the testimony and that there are numerous factual discrepancies that preclude summary judgment.  On May 2, 2005, Magistrate Judge Wilkerson allowed the parties leave to conduct additional discovery,  extended the dispositive motion deadline and allowed the parties to supplement the motion for summary judgment based on the new discovery and retaliation and sex discrimination disparate claims (Doc. 37).[1]

## II.  **Facts**[2]

Mueth began working at Wessel's Market in about March 2001.[3]  (Mueth

---

[1]For the first time in the supplement, Norrenberns moves for summary judgment on Mueth's retaliation claim and sex discrimination disparate treatment claims.  This order *only* addresses Mueth's sexual harassment hostile work environment claim.  The Court will address the other claims after they have been appropriately briefed.

[2]The majority of the facts are taken from Mueth's deposition.

[3]Wessel's Market is a locally owned and operated grocery store in Smithton, Illinois.  It is a part of Norrenberns Foods Inc., which is owned by Donald and John Norrenberns.

Depo. p. 12-13).  Prior to working at Wessel's Market, she was a stay at home mom for eight years.  (Mueth Depo. p. 7).  Mueth expressed to Wessel's Market that she did not want to work that many hours because of her children.  She requested weekends off, during the school year she wanted to work the day shift, and during the summer months, Mueth wanted to work at night.  (Mueth Depo. ps. 15, 22, 23).  She was hired as a part-time book keeper, working a few hours a day for three days a week.  (Mueth Depo. p. 14-15).  After working as a book keeper for about three or six months, Mueth spoke with a supervisor about acquiring additional hours as a cashier.  (Mueth Depo. ps. 20 & 29).  Mueth was given the job as a cashier at that time.  (Mueth Depo. ps. 20 & 24).  During the period from October to December 2001, Mueth was working around 12 hours a week and 4 of the hours Mueth worked as a book keeper. (Mueth Depo. p. 25).

Gary Saeger began working as a manager at Wessel's Market in September 2001.  (Saeger Depo. p. 6-7).  As store manager, Saeger's duties include hiring and firing employees, scheduling, ordering and stocking the store.  (Saeger Depo. p. 8).  Saeger manages approximately twenty-four people, including bag boys, cart gatherers, courtesy clerks, and cashiers at the Wessel's Market.  (Saeger Depo. p. 14).

Mueth and Saeger went to Belleville East High School together (Mueth Depo. p. 30).  Mueth knew of Saeger in high school, but did not know much about him.  (Mueth Depo.. p. 30).  About a month after Saeger began working at Wessel's Market, he began making comments/compliments to Mueth. (Mueth Depo. p. 40).

The comments included: "God, you look really good today," "You look hot," "Man, that shirt looks good on you," "You look nice and perky today," and "Your hair looks good." (Mueth Depo. ps. 40-41). Initially, Mueth took these comments as compliments and would respond "thank you." (Mueth Depo. p. 41). These kind of comments occurred daily and continued for about three months. At first, Mueth was okay with them. (Mueth Depo. p. 44). Saeger admits that he made these comments. (Saeger Depo. p. 50).

On December 12, 2001, Mueth wrote a note regarding her working hours to Saeger addressed "Dearest Gary." (Mueth Depo. p. 190).[4] Mueth testified that she typically does not address the notes to Saeger in that fashion. (Mueth Depo. p. 190). She meant it to just be nice, not as a term of endearment. (Mueth Depo. ps. 190-191).

In January 2002, Saeger started making comments that were sexual in nature. (Mueth Depo. ps. 33-34 & 45).[5] According to Mueth, the comments became "nasty" at this time. (Mueth Depo. ps. 35, 46, 48). Mueth cannot remember the exact dates that Saeger made these comments to her. The one comment that sticks in Mueth's mind is that Saeger told her that he could make her cry for her mama. (Mueth Depo. p. 46). Mueth was embarrassed by the comment and turned red (Mueth Depo. p. 48). She "just sloughed it off" and went right back to doing her

---

[4]At this time, Mueth's hours were Monday through Wednesday, 8:00 to 12:00. (Mueth Depo. p. 192).

[5]Usually, the conversations between Saeger and Mueth occurred in Saeger's office while Mueth was doing the book keeping. (Mueth Depo. p. 46-48).

work (Mueth Depo. p. 48).

In the week before March 4, 2002, Mueth wrote another note requesting time off to Saeger.  She addressed the note "Dearest Gary."  Mueth was just being nice.  (Mueth Depo. p. 193).

Prior to July 2002, Saeger told Mueth at least 25 times that he would like to give her a tongue bath.  (Mueth Depo. p. 51).

At least on three occasions prior to July, 2002, Saeger invited Mueth over to his house to use his whirl pool.  (Mueth Depo. p. 66).  Saeger told Mueth where she could hide her car so that no one would know she was at his house (Mueth Depo. p. 65-68).

Another time Mueth told Saeger that her back was hurting and Saeger gave her a massage (Mueth Depo. p. 66).  Mueth thinks that this happened before July 19, 2002 (Mueth Depo. p. 66).  She did not tell him to stop, the massage was "strictly on my shoulders."  (Mueth Depo. p. 67).  She was not uncomfortable with Saeger doing this to her.  (Mueth Depo. p. 67).

"When everything was still halfway cool", Mueth gave Saeger a shoulder rub.  (Mueth Depo. p. 177).  Mueth thinks that this occurred before July 2002. (Mueth Depo. p. 178).

At least one time prior to July 2002, Saeger asked Mueth to see her breasts (Mueth Depo. p. 67).  This conversation occurred after Mueth requested to take off work for personal surgery.  (Mueth Depo. p. 68).  Mueth had told Saeger (after many guesses of what kind of surgery she was having) that she was having

surgery on her upper region.  (Mueth Depo. p. 68).  Saeger guessed breast surgery,

Mueth acknowledged that he was correct and told him that she was having a breast

lift.  (Mueth Depo. ps. 69-70).  He stated that he wanted to see the before and after

pictures.  (Mueth Depo. ps. 67 & 70).  This occurred right before her breast surgery.

(Mueth Depo. p. 67).

Sometime in June 2002, Saeger asked Mueth what she would do if he

kissed her.  (Mueth Depo. p. 71).  She told him that she would smack him. (Mueth

Depo. p. 71).

Sometime prior to July 2002, Saeger called Mueth at home and asked

her if her husband was home.  (Mueth Depo. p. 55).  Mueth responded that her

husband was home and that she was in the bedroom (Mueth Depo. p. 55).  Saeger

then asked her if she was naked.  (Mueth Depo. ps. 54-56).  At least on three or four

different occasions, Saeger asked Mueth on the phone if she was naked.  (Mueth

Depo. p. 54).  At first, this did not make Mueth uncomfortable (Mueth Depo. p. 56).

Sometime in June 2002, Mueth told Saeger that he was crossing the

line. (Mueth Depo. ps. 56-57).  Saeger apologized and said that he was just joking

around. (Mueth Depo. p. 57).

In July 2002, Mueth called Donald Norrenberns ("Don") to schedule a

meeting with him to discuss Saeger. (Mueth Depo. p. 73).  She met him at his office

in Mascoutah, Illinois on July 19, 2002. (Mueth Depo. ps. 58-60, 74; Defendant's

Exhibit A).  At that time, Mueth informed Don for the first time that Saeger was

sexually harassing her.  She gave him a sheet of things that Saeger had been saying

to her. (Mueth Depo. p. 74).  Mueth also told Don that she did not want to get Saeger into trouble. (Mueth Depo. p. 79).  Don told Mueth that he would talk to Saeger, that Norrenberns does not tolerate that kind of conduct, that he would place a written notice in Saeger's working file and that Mueth should let him know if there was any further problems.  (Mueth Depo. p. 79).

After the meeting with Mueth, Don prepared a written reprimand for Saeger, telephoned Saeger and met with him.  He told Saeger that sexual harassment of any kind would not be tolerated at Norrenberns and any further reports of such conduct could lead to his dismissal.  Thereafter, Don never received any more reports from Mueth regarding Saeger and sexual harassment.  (Mueth Depo. p. 79).

The next day, Saeger called Mueth at her home and requested that she come to Wessel's Market to discuss her complaints. (Saeger Depo. p. 40).  Mueth obliged and when she arrived at Wessel's Market, Saeger apologized and told her that the comments would stop.  (Saeger Depo. ps. 40-41; Mueth Depo. ps. 58-59).  Mueth testified that she told Saeger the following during their meeting:

> "I was sorry that I had to do it, because I had told my husband what has been going on, and my husband knew the comments that he was making towards me, and my husband – I don't want to say made me, but he wanted me to go to the owner.  So, I went – I thought I could handle it on my own, but my husband pretty much insisted that I report it to the owner."

(Mueth Depo. p. 60).  Mueth also told Saeger that her husband became aware of the comments that Saeger had been making because her husband overheard Saeger on the phone.  (Mueth Depo. p. 60).

Towards the end of the meeting, Saeger hugged Mueth, offered to pick lint off her breast and told her that she would always have his heart. (Mueth Depo. p. 91). Mueth told him to "watch it." (Mueth Depo. p. 91). Mueth did not tell Don about the comments Saeger made to her at that meeting. (Mueth Depo. p. 92). Thereafter, the comments from Saeger stopped for a short while.

On August 3, 2002, Saeger said to Mueth "Any time you're ready day or night, just let me know." (Mueth Depo. p. 99). Mueth took that comment to mean that any time she wanted to sleep with Saeger she should let him know. (Mueth Depo. ps. 99-100). She does not remember what she said to Saeger in response or asking him to stop making such comments. (Mueth Depo. ps. 100-100).

On August 12, 2002, Saeger told Mueth that if she needed anyone to help change her bandages or to help her out of bed to call him (Mueth Depo. p. 105). Mueth testified that Saeger told her that once she has her surgery he will not be able to keep his hands off of her. (Mueth Depo. p. 105). He further told her that he made a special trip to the store to see her before her surgery. (Mueth Depo. p. 106). She told him that she could change her own bandages and that he should not be making those comments to her. (Mueth Depo. p. 106).

On September 1, 2002, Saeger made comments such as "tongue bath" that he wanted a hug, and to call her day or night and he would be there. (Mueth Depo. p. 107). Saeger also asked her if she wanted to go to the ball game and that she could tell her husband that she was going with girls from work. (Mueth Depo. p. 107).

On September 10, 2002, Saeger called her at home, asked her out to lunch and wanted to see her bruises from surgery. (Mueth Depo. p. 113). She told him that he should not be asking her those things and that it was none of his business. (Mueth Depo. p. 114).

On September 13, 2002, Saeger told her he was going to make her cry for her mama, that she looked fine and that the hardest thing about work is keeping his hands off her. (Mueth Depo. p. 114). He said these comments to her in his office while she was doing book work. (Mueth Depo. p. 115). She told Saeger that they could talk as friends and talk on an employee/friend level but that he was taking it to a different level. (Mueth Depo. p. 115).

On September 24, 2002, Saeger told Mueth that he would like to give her a massage and asked her to come use his whirl pool. (Mueth Depo. p. 116). During this conversation, Mueth was talking to Saeger about an employee stealing from the store. Mueth asked who the employee was and Saeger responded that there was only one way he would tell her or that she could give him a "HJ" which Mueth took to mean "hand job." (Mueth Depo. p. 116). Again, Mueth told Saeger that she wished he would quit asking her to his house, that she was married and plans on staying married. (Mueth Depo. p. 116).

On November 12, 2002, Saeger told her that she "looked hot." (Mueth Depo. p. 120). She responded "Thanks." (Mueth Depo. p. 121).

On November 13, 2002, in response to Mueth asking if she could have a raise, Saeger asked the owners if Mueth could have a raise. (Mueth Depo. p. 121).

Mueth got a 25 cent raise and Saeger told her that she owed him big time.  (Mueth Depo. p. 121).

That same day, Saeger again made comments regarding "tongue bath," "cry for mama," and "whirl pool."  (Mueth Depo. p. 122).  He also told her that "he could have me satisfied within seven minutes," that "he wants to give me a body massage and he said that he wants me to come over to his house before Thanksgiving to use his whirlpool."  (Mueth Depo. p. 122).  She told Saeger that he was disgusting and walked out of the office.  (Mueth Depo. p. 123).

On November 20, 2002, Saeger told Mueth "guaranteed that I would be crying for mama within seven minutes.  He said that he had something in his pocket, and he asked me to dig in his front pocket to get it."  (Mueth Depo. p. 123).  Mueth responded "I don't want to know what is in your pocket."  (Mueth Depo. p. 124).  Mueth told Saeger that he was crossing the line.  (Mueth Depo. p. 124).  Saeger agreed with her and she thought that it would be okay.  Mueth Depo. p. 124).  She cannot remember when she said this to Saeger; just knows that she has said this to him one or more times.  (Mueth Depo. p. 124).

On November 21, 2002, Saeger bet her $200 that he could outlast Mueth during sex and asked her about coming over to use the whirl pool.  (Mueth Depo. p. 124).

On November 22, 2002, Mueth's husband called John Norrenberns ("John").  (Mueth Depo. p. 125).  Mueth's husband told John that Saeger was getting worse and told John about Saeger's latest comments.  (Mueth Depo. p. 125).

Saeger testified that he spoke with John. (Saeger Depo. p. 46).  John told Saeger "just be careful, stuff's got to stop."  (Saeger Depo. p. 46).

On November 25, 2002, Saeger told Mueth that she "looked hot and foxy today." (Mueth Depo. p. 129).

On December 9, 2002, Saeger said to Mueth "you look really good today." (Mueth Depo. p. 130).  This comment did not bother Mueth.  (Mueth Depo. p. 130).

On December 16, 2002, Mueth wrote a note regarding Saeger that indicates that Saeger does not speak to her:  "Maybe a hello, but that is it." (Mueth Depo. p. 130).  It bothered her that Saeger was not talking to her.  (Mueth Depo. p. 131).  She testified "Well, I did not like to be not talked to at all.  I mean, employee/employer conversation would have been nice, but he didn't say – he, basically, avoided me at all cost." (Mueth Depo. p. 131).

On December 17, 2002, Mueth asked Saeger if he was mad at her. (Mueth Depo. p. 131).  Saeger answered no and stated that he "better not say anymore so that I do not get in trouble." (Mueth Depo. p. 131).

On December 18, 2002, Saeger asked Mueth what she wanted for Christmas. (Mueth Depo. p. 132).  Mueth told him an X Box. (Mueth Depo. p. 132).  Saeger then asked her if she wanted a necklace to which Mueth responded "Sure.  Who is going to get me one." (Mueth Depo. p. 132).  Saeger told her that he wanted to buy her a gold necklace. (Mueth Depo. p. 132).  Then, Mueth asked Saeger if he was going to get the rest of the female employees necklaces.  (Mueth Depo. p. 132).

Saeger said "No, just you," and then said "Maybe it will make your husband mad." (Mueth Depo. p. 132).  Mueth told him that it was not a good idea.  (Mueth Depo. p. 133).

On December 19, 2002, Mueth gave Saeger and Jeannie Buss a box of Fannie Mae Chocolates just like she did last year.  (Mueth Depo. p. 133).  Around this time, Saeger and three or four other employees were standing around the store talking and drinking beer.  (Mueth Depo. p. 185).  Mueth joined them and had one beer.  (Mueth Depo. p. 185).

On March 4, 2003, Jeannie Buss told Mueth that Gary said that she had to wear an apron like everyone else.  (Mueth Depo. p. 134).  This was the first time in two years that she was told to wear an apron.  (Mueth Depo. p. 134).

During the week of March 15, 2003, Mueth was scheduled to work Monday through Wednesday, 8:00 to 12:00 as a cashier.  (Mueth Depo. p. 134).  Her regular hours are Monday through Thursday, 8:00 to 12:00 (Mueth Depo. p. 134).  She had been working those hours for about four months.  (Mueth Depo. p. 134).

On March 5, 2003, Mueth volunteered to give up a four-hour shift to correct a schedule because "Gary scheduled three people to work the same shift on Thursday." (Mueth Depo. p. 135).  Neither Saeger nor any other supervisor told any employee that they had to go home.  (Mueth Depo. p. 135).

On March 11, 2003, Mueth wrote an entry that states:

"took a peek at next week's schedule.  I'm only scheduled Monday through Wednesday again next week.  This will be two weeks in a row my hours have been cut.  My regular hours are Monday through

> Thursday, 8:00 to 12:00.  I haven't seen or heard from Gary since I
> started back to work.  The meat cutters and most other male employees
> don't talk to me, unless I say something to them."

(Mueth Depo. p. 136).

After she wrote this entry, Mueth faxed Saeger a letter saying that she wanted her

regular hours back. (Mueth Depo. p. 137).  Mueth was given her regular hours back.

(Mueth Depo. p. 137).

Sometime after July 2002 prior to January 2003, Mueth wrote a note

to Saeger that stated in part: "Thanks for the surprise.  I guess that I will forgive you.

Ha ha."  (Mueth Depo. p. 197).  This was in reference to Saeger leaving cut up fruit

for Mueth in the refrigerator for her at work.  (Mueth Depo. p. 197).  Mueth was

forgiving Saeger for being a pervert.  (Mueth Depo. p. 197).  Another time after July

2002, Saeger left fruit for Mueth and she wrote him a another note thanking him.

(Mueth Depo. p. 198).  The note was addressed "Dearest Gary" and said "Thank you

for the special treat."  (Mueth Depo. p. 198).  Saeger frequently would leave fruit for

Mueth.  (Mueth Depo. p. 198).  He did not do this for other employees.  Mueth never

told Saeger not to leave fruit for her.  (Mueth Depo. p. 199).

On one occasion, Saeger asked Mueth what her bra size was.  (Mueth

Depo. p. 175).  Mueth responded "Why do you want to know?"  (Mueth Depo. p.

175). To which, Saeger said "'I'm just curious.  I'm thinking about' – and he's giving

out numbers of what he thought it was, trying to guess."  (Mueth Depo. p. 175).

Mueth finally told him.  Saeger told her that he did not believe her and asked her to

prove it. (Mueth Depo. p. 175).  Mueth then ripped the tag offer her bra and showed

it to Saeger. (Mueth Depo. p. 175). Saeger wanted the tag, but Mueth took it home and threw it away. (Mueth Depo. ps. 176-177). Mueth does not remember when this happened. (Mueth Depo. p. 176).

Another time, Mueth brought Saeger a piece of her homemade meatloaf to work. (Mueth Depo. p. 179). Saeger was taunting Mueth about her meatloaf. (Mueth Depo. p. 179). Mueth told Saeger that she had to sneak out the meatloaf because her husband would not like her taking his leftovers away. (Mueth Depo. p. 180). She does not recall when this happened, but she is sure that it happened in 2002. (Mueth Depo. ps. 179-180).

Between September 2001 and January 2003, Saeger gave Mueth tickets to two ball games and one truck race. (Mueth Depo. ps. 186-187).

Mueth believes that Saeger said more things to her than she identified on the list. She put everything vulgar that he told her on the list. (Mueth Depo. p. 122). No one else knew that Saeger was making these comments to her. (Mueth Depo. p. 128). She did not tell Don that the conduct continued. (Mueth Depo. p. 128).

Wessel's Market does not have a sexual harassment policy in place. (Saeger Depo. p. 13). Wessel's Market does not have training regarding sexual harassment in the workplace. (Saeger Depo. p. 13). Wessel's Market does not have information regarding sexual harassment posted in the store. (Doc. 21; Mueth Affidavit, Exhibit C). Wessel's Market does not have an employee handbook. (Saeger Depo. p. 13; Doc. 21; Mueth Affidavit, Exhibit C).

### III.  <u>Summary Judgment</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c)**; *Wyatt v. UNUM Life Insurance Company of America*, **223 F.3d 543, 545 (7th Cir. 2000);** *Oates v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997);** *See also Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)).**  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Wollin v. Gondert*, **192 F.3d 616, 621-22 (7th Cir. 1999)**.  The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Schneiker v. Fortis Insurance Co.*, **200 F.3d 1055, 1057 (7th Cir. 2000);** *Baron v. City of Highland Park*, **195 F.3d 333, 337-38 (7th Cir. 1999)**.

In reviewing a summary judgment motion, the Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. *EEOC v. Sears, Robuck & Co.*, **233 F.3d 432, 436 (7th Cir. 2000)**. No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted...." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 249-50 (1986)**. **Accord** *Starzenski v. City of Elkhart*, **87 F.3d 872, 880 (7th Cir. 1996), cert. denied, 117 S. Ct. 683**

(1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994).

This standard should be applied "with added rigor" in employment discrimination cases, in which intent and credibility are crucial issues.  *Webb v. Clyde Choate Mental Health and Development Center*, 230 F.3d 991, 997 (7th Cir. 2000);  *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *King v. Preferred Technical Group, Inc.*, 166 F.3d 887, 890 (7th Cir. 1999).  This standard reflects pronouncements that in employment discrimination cases, which often involve issues of motive and intent, summary judgment must be approached with caution.  *Huhn v. Koering Co.*, 718 F.2d 239, 242 (7th Cir. 1983).  *Huhn* relied on an earlier case which recognized that, although summary judgment is improper in employment discrimination cases which involve "weighing of conflicting indications of motive and intent,"where a plaintiff has no evidence of discriminatory motive to "put on the scales for weighing," summary judgment *is* appropriate.  *Id.*

## IV.  <u>Analysis</u>

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." **42 U.S.C. § 2000e-2**.  There are several ways to frame a Title VII claim; the Court considers Mueth's claims as hostile work environment and retaliation.

"An employer violates Title VII if it is responsible for a 'hostile work environment.'" *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421,

426 (7th Cir. 2004)(citing *Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000)).  A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001).  To prevail on her claim of sexual harassment based on hostile work environment, Mueth must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. *Quantock v. Shared Marketing Servs., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002); *Mason*, 233 F.3d at 1043.

Many of the incidents alleged in the case, when taken alone, would not be sufficient by themselves to reach the "severe or pervasive" standard required to support a hostile work environment claim. *See, e.g. Salvadori v. Franklin Sch. Dist.*, 292 F.3d 989, 991 (7th Cir. 2002); *Drake v. 3M*, 134 F.3d 878, 883-86 (7th Cir. 1998).  However, the Court must consider the totality of the relevant circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).

A. **Unwelcome Sexual Harassment**

"The gravaman of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'.... [T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility

determinations committed to the trier of fact ..."  ***Reed v. Shepard*, 939 F.2d 484, 491 (7ᵗʰ Cir. 1991) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986)**.  "The correct inquiry is whether [the victim] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation . . . was voluntary."  ***Id.***

Drawing all reasonable inferences in the light most favorable to Mueth, the Court finds that there is evidence which demonstrates that Mueth indicated to Wessel's Market and Saeger that Saeger's conduct was unwelcome.  On several different occasions, Mueth testified that she told Saeger to stop making the comments to her.  She also testified that she was embarrassed by the "nasty" comments in early 2002.  She further testified that she was offended and shocked by Saeger's behavior.  Thus, Mueth has satisfied the first prong.

B.  **"Based on" Gender**

The Court finds that there is no dispute that Plaintiff's evidence of sexual comments and conduct were directed towards her because of her gender.[6] Therefore, Mueth has established this element.

C.  **Hostile Work Environment**

In order to establish the "hostile work environment" element, the plaintiff must submit evidence that she was subjected to conduct "'so severe or pervasive as to alter the conditions of [her] employment and create an abusive

---

[6]In its summary judgment pleadings, Defendant does not address this issue.

working environment.'" ***Quantock*, 312 F.3d at 903**.  Moreover, to qualify as

"hostile," the work environment must be "both objectively and subjectively

offensive…." ***Id***.  In determining whether conduct is "severe or pervasive" enough to

alter conditions of employment, courts look at "the totality of the circumstances,

including … the 'frequency of the discriminatory conduct, its severity, whether it is

physically threatening or humiliating or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" ***Quantock*, 312**

**F.3d at 904 (quoting *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889**

**(7th Cir. 2001))**.  This court, however, must be careful not to equate objectionable

conduct with harassing or abusive conduct.  ***See Wyninger v. New Venture Gear,***

***Inc.,* 361 F.3d 965, 975-76 (7th Cir. 2004)**.

     i. **Subjective Viewpoint**

       Mueth states that because of Saeger's behavior she switched being

available for work to avoid being there at the same time as Saeger.  Mueth further

testified that she had to be careful when bending down around him and that she was

suspicious when Saeger would call her into the office.  She complained about the

offensive conduct to Norrenberns.  She is not comfortable going to work anymore.

Further, Mueth testified that she has suffered from and treated for depression

because of Saeger's behavior.  (Mueth Depo. ps. 238-242; 244; 247-250).    Mueth

also testified that her daughter does not want her to go to work anymore and that

adversely impacts her desire to go to work.  (Mueth Depo. ps. 220-236).  This

evidence is sufficient to create a factual issue on the question of whether Mueth subjectively perceived her work environment to be hostile.  **See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1454 (7th Cir. 1994)(citing Harris, 510 U.S. at 21-22)(deposition testimony of the plaintiff stating that supervisor's conduct upset and embarrassed her and made her feel uncomfortable, that his comments caused her to walk out of his office, that she just wanted the comments to stop, and that she complained to supervisor held sufficient to create a factual issue as to subjective perception of hostile environment)**.

Defendant also argues that because Mueth testified that the conduct did not interfere with her ability to do her job, the harassment did not rise to a hostile working environment and Title VII violation.  While interference with work performance is certainly one of the factors to consider when analyzing the severity of workplace harassment, "no single factor is required."  **Saxton v. A.T. & T. Co., 10 F.3d 526, 534 (7th Cir. 1993)(citing Harris, 510 U.S. at 17)**.  Further, the consideration of interference with performance "[is] not intended to penalize the employee who possess the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive sexual banter....[T[hat women who are the objects of discriminatory behavior because of their sex are able to maintain satisfactory job performance is not grounds for denigrating their concerns." **Dey, 28 F.3d at 1454-55 (internal citations omitted)**.  The fact that Mueth's job performance did not suffer as a result of the harassment is not evidence that she did

not subjectively perceive her work environment as hostile.

    ii. **Objective Viewpoint**

        The Seventh Circuit has recognized that drawing the line between sexual harassment and non-actionable workplace vulgarity is not always easy. ***See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995)**. The Court noted:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is not consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Id*. In that case, the Seventh Circuit found that a supervisor's behavior did not constitute harassment because he never touched the plaintiff, never explicitly or implicitly invited her to have sex with him or to go out with him, never threatened her, exposed himself, showed her dirty pictures or said anything to her that could not be repeated on television. ***See id.* at 431**.

        In contrast, much of the alleged conduct falls on the other side of the line. Here, Mueth was subjected to repeated sexual solicitations from Saeger (he would like to give her a "tongue bath," he could make her "cry for mama," he would "have her satisfied in seven minutes" and asked her to come to his house to use the whirl pool, asking her if she was naked). These daily acts of sexual solicitation constitute more just "the occasional vulgar banter. . . of coarse or boorish workers." ***Id*, at 430**. Based on the evidence, there remains a genuine issue of material fact

with regard to whether the actions of Saeger created a hostile work environment which was severe or pervasive, and both objectively and subjectively hostile.

     D. **Employer Liability**

       "The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker." ***Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 505 (7th Cir. 2004)**. An employer may be vicariously liable for the harassing actions of its supervisors. ***Faragher, v. City of Boca Raton*, 524 U.S. 775, 807 (1998)**. For the purposes of Title VII, supervisors must have the power to directly affect the terms and conditions of the plaintiff's employment, which includes the authority to hire, fire, promote, demote, discipline or transfer the plaintiff.  Here, Saeger admits in his deposition that he had the power to hire and fire employees and he was Mueth's supervisor.  Therefore the Court must determine whether Norrenberns is liable for Saeger's actions.[7]

       When a supervisor engages in sexual harassment, the employer is liable only if the harasser took a tangible employment action as part of the harassment. ***Faragher*, 524 U.S. at 807**.  No affirmative defense is available under ***Faragher*** and ***Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)**, when the supervisor's harassment culminates in a tangible employment action. ***Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003)**.

---

[7]The Court notes that neither party disputes that Saeger was Mueth's supervisor.

Since no tangible employment action was taken, Mueth must show that Norrenberns was negligent in discovering or remedying the harassment. **Durkin, 341 F.3d at 612**. "An employer may defend against harassment charges by showing it exercised reasonable care to discover and rectify promptly any sexually harassing behavior." **Id**. "Since an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable." **Id**. Courts "consider whether an employer had notice of the sexual harassment by considering the channel for complaints of harassment." **Id. (citing Hall v. Bodine Elec. Co., 276 F.3d 345, 356-57 (7th Cir. 2002))**.

By Norrenberns' own admission, there was no formal sexual harassment policy in place, nor was there any information provided to Mueth to allow her to mitigate or take corrective actions against Saeger. Mueth did what Norrenberns told her to do. She went to Don to complain about Saeger's conduct. After speaking and meeting with Saeger, Don told Saeger to "work things out" with Mueth. There was neither an investigation nor was any other action (except for the written reprimand) taken towards Saeger. Both Saeger and Mueth testified that the comments continued long after the reprimand. Therefore, there is a question of fact as to whether or not Defendant took reasonable steps to prevent the sexual harassment from continuing. Furthermore, there is a question of fact as to whether or not Norrenberns took prompt action to correct the problem. Thus, the Court denies Norrenberns' motion for summary judgment based on her hostile work environment claim.

**IV.  Conclusion**

Accordingly, the Court **DENIES** Defendant's motion for summary judgment (Doc. 18).  The Court **SETS** this matter for Final Pretrial Conference on August 19, 2005 at 11:00 a.m.

**IT IS SO ORDERED.**

Signed this 21st day of June, 2005.


/s/    David RHerndon
**United States District Judge**